IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

ANNA M. AUSTIN,

                    Plaintiff,

          vs.                                **Case No. 03-4130-RDR**

U.S. BANK, National
Association,

                    Defendant.

_____

**MEMORANDUM AND ORDER**

I.   INTRODUCTION

          Plaintiff  has  brought  this  action  alleging  the  breach  of
fiduciary  duties  and  a  breach  of  contract  against  defendant.
Defendant  is  a  bank  in  Topeka,  Kansas  which  has  formerly  operated
as  Firstar  Bank,  Merchants  National  Bank  of  Topeka,  and  Mercantile
Bank  of  Topeka.   This  case  arises  from  a  trust  agreement
established  by  plaintiff's  late  father.   Defendant  was  the  trustee;
plaintiff  was  a  beneficiary.   This  case  is  now  before  the  court
upon  defendant's  motion  for  summary  judgment.

II.  UNCONTROVERTED FACTS

          Plaintiff  is  the  only  child  of  E.J.  "Tex"  Erp,  who  died  on
June  8,  1995.   He  had  no  surviving  spouse  when  he  died.   Mr.  Erp
was  an  accountant  and  businessman  who  owned  and  operated
restaurants  in  Topeka.   He  also  owned  approximately  140  acres  of
farmland  north  of  Topeka.   In  1993,  a  large  portion  of  this
farmland  was  devoted  to  a  residential  subdivision  project  called

Hickory Ridge Estates.   The project was incorporated as Hickory Ridge Estates, Inc. ("HRE") in 1994.   Prior to Mr. Erp's death in June 1995, HRE borrowed money from Mercantile Bank of Topeka and First Colonial Securities.

Mr. Erp was the grantor and original trustee of the E.J. Erp Revocable Trust.   Upon Mr. Erp's death, Mercantile Bank was appointed to serve as successor trustee.   Under the trust agreement, two trusts were created upon Mr. Erp's death:  the E.J. Erp Charitable Remainder Trust (the "CRT") and the E.J. Erp Trust, which the parties refer to as "Trust A".

According to the trust agreement, upon Mr. Erp's death certain items were to be done.   These items included that some real estate was to be transferred to HRE, and the stock of HRE was to be transferred to Trust A.   Real estate which was not transferred to HRE was to be sold as soon as reasonably possible, and Mr. Erp's home was to be sold as soon as economically feasible on the best terms and conditions obtainable by the Trustee.   To the extent the Trustee deemed it economically feasible, the Trustee was not to sell HRE in one lump sum, but was to continue to develop the land at a pace of 20 to 30 lots at a time.   The caretakers of Mr. Erp's farmland were given the option of remaining there and serving as caretakers of HRE or vacating their residence on the property and receiving a payment of $25,000.00.   Additionally, the Trustee was directed to distribute to plaintiff from Trust A annual payments

for her lifetime.   These payments were to be in the amount of $30,000 in the year of Mr. Erp's death prorated based on the date of his death.   Thereafter, the amount was to increase annually by 3%.   Payments were to be made from the income and, if necessary, the principal of Trust A.   Any leftover income was to be distributed to Mr. Erp's four siblings and the vice-president of HRE, Mari Jaquith.

The trust agreement provided for the distribution of Mr. Erp's personal property, including artwork and antiques.   The trust agreement stated that assets not otherwise distributed under the agreement were to be placed in the CRT.   The value of the assets placed in the CRT after Mr. Erp's death was approximately $500,493.00.   The trust agreement further provided that the CRT would pay to Trust A for a period of 20 years after Mr. Erp's death an amount equal to 6% of the net fair market value of the assets of the CRT valued as of the first day of each taxable year.   According to the trust agreement, the liabilities of Mr. Erp's estate were to be paid from the assets passing to Trust A.

Shortly after Mr. Erp's death on June 8, 1995, plaintiff hired an attorney, Mr. Arthur Glassman, to represent her.   Mr. Glassman communicated with Mercantile Bank, the Trustee, regarding items of Mr. Erp's property that plaintiff wanted.   At that time Ms. Shelli Crow-Johnson was the trust administrator for the bank.

By February 13, 1996, plaintiff had hired Robert D. Hecht as

3

her attorney.   On that date, Mr. Hecht wrote to the trust administrator requesting copies of trust documents, accounting, appraisals and other records regarding HRE.   The trust administrator sent Mr. Hecht a copy of the trust agreement, a valuation of the CRT and the stock of HRE, the 1995 accounting and receipt disbursements for Trust A, and a date of death inventory for Trust A and the CRT.   The trust administrator also discussed the distribution of Mr. Erp's personal property.

After receiving this response, Mr. Hecht wrote on April 22, 1996 that he did not have all the information he requested and that he would file suit on behalf of plaintiff on May 1, 1996 to compel disclosure of the requested information and to remove Mercantile Bank as Trustee.   On May 1, 1996 the trust administrator provided more information to Mr. Hecht.   She advised that Trust A was the sole shareholder of HRE and identified the officers and directors of HRE.   She further advised Mr. Hecht that the assets of the trusts were in the possession of either Mercantile Bank or First Colonial Securities.   First Colonial held some of the assets because of Mr. Erp's loan there.   Mercantile Bank intended to pay off that loan once Mr. Erp's farmland owned by Trust A was sold. She later explained in a letter dated May 31, 1996 that the First Securities loan was a liability of Trust A, not the CRT.   She also informed Mr. Hecht that the caretakers of the farmland had decided to waive their right to remain on the land and, as a result, were

4

paid $25,000.00 according to the terms of the trust agreement.  She reported the sale price of Mr. Erp's residence.  She further stated that Mr. Erp had anticipated the large start-up costs that HRE had encountered and that "it will be a number of years (3-5) before income will be generated by the corporation."  Doc. No. 166, Ex. 8.

On or about March 5, 1997, the trust administrator (now Rebecca Miller) and the trust department manager met with plaintiff and Mr. Hecht to discuss Trust A and the sale of the farmland held in Trust A and HRE.  It was mentioned that the farmland held in Trust A was not zoned for industrial or light commercial and that this made the land less valuable.  Mr. Hecht advised that Mercantile Bank should sell the farmland without trying to rezone it.  An offer to buy the farmland had been made by the tenant, Neil Warner.  However, this offer had been declined either because the trust administrator did not like Mr. Warner or because the land was in the process of being rezoned.

Plaintiff had concerns about the operation of the Trusts and HRE by March 1997.  In response to her concerns about HRE, the head of the defendant's trust department (Dan Brogren) said that HRE would be run with "on-the-job training, and that it would make $3 million."  Deposition of plaintiff, p. 192.

On April 7, 1997 the trust administrator advised plaintiff that she would begin receiving statements for both Trust A and the CRT with printouts showing transactions on both trusts since they

were split into Trust A and CRT.  Plaintiff had received a statement or statements earlier from the bank, but she had difficulty understanding them.

On the same date, the trust administrator informed plaintiff of the sale price of Mr. Erp's house and the reason for accepting an offer which was less than the appraised value.  She listed five life insurance policies and the amount they paid to the trust in 1995.  She further advised plaintiff that plaintiff would "receive $30,000 (plus the annual 3% increase) regardless of whether or not the trust has income."  Exhibit 16 to motion for summary judgment. There was also a discussion of a tax payment that Trust A made on plaintiff's behalf in 1996 which would be subtracted from plaintiff's 1998 distribution.   Thereafter, plaintiff began receiving monthly statements for Trust A and the CRT.

On June 19, 1997 plaintiff received additional information regarding payment of Mr. Erp's margin loan at First Colonial.  The trust administrator stated in a letter on that date:

> Earlier this spring, the margin account at First Colonial was paid off when one of the assets (a U.S. Treasury Note) matured.  The balance of the assets over the margin debt were distributed to the Charitable Remainder Trust (CRT) and have been reinvested . . .
>
> Because the trust document directs that all assets (other than Hickory Ridge and Meat and Cheese Shop) were to be transferred to the CRT and all liabilities were to be transferred to Trust A, the liability caused by the margin account is listed in Trust A.  Even though the account was paid off at First Colonial, the liability still exists, because without the margin debt, the assets in the CRT would be greater. . . .

Exhibit 17 to motion for summary judgment.  The letter also stated that the development at Hickory Ridge "is going well and is in fact ahead of schedule"; that they would soon begin Phase II; that all lots sold to date had brought full price; that the spec house in Phase I had sold and would close in the next month; and that a local business had expressed interest in purchasing "some or all" of the 40 acres of real estate south of Soldier Creek.  Id.

On November 5, 1997 the trust administrator wrote a letter received by plaintiff which stated that Trust A was overdrawn.  The letter attributed the overdraft to the account's condition of being "real estate 'rich' and cash poor."  It projected that the overdraft would be paid "as soon as the real estate sale goes through."  The letter said that defendant was working to have the farmland rezoned and had a purchase offer contingent on rezoning. The letter did not indicate that rezoning might not occur.  Exhibit 18 to summary judgment motion.

By March 16, 1998 plaintiff was represented by a different attorney, Mr. Darin M. Conklin.  Mr. Conklin advised plaintiff in a letter on that date that he did not know if a breach of the trust agreement had occurred and, if it had, when it occurred.  Plaintiff was aware that one officer of HRE had resigned and she was apprehensive as to whether the remaining officer, Mari Jaquith, could operate HRE successfully.

By September 1998 plaintiff requested that her accountant (Mr.

7

Robert Holmes) make an assessment of the two trusts and HRE. Plaintiff suspected that something was wrong with the two trusts in September 1998 because no money was coming in and HRE was building spec homes. She was also concerned about how the spec homes were being priced.

In letters to Mr. Conklin and to plaintiff in September and October 1998, the accountant advised that:

- A demand note from Trust A in the amount of $143,565.66 was listed as an asset of the CRT and a corresponding liability in the same amount was listed as a liability for Trust A;
- The demand note did not appear to bear any interest;
- Trust A reflected an overdraft in the amount of $2,632.00;
- HRE was not generating cash flow to Trust A; Ms. Jaquith was building spec homes at Hickory Ridge, including her own home on a lot she purchased at a discount;
- Mercantile Bank was providing financing to HRE.

Mr. Holmes also made the following comments about HRE:

- It did not seem impossible for Hickory Ridge to generate the necessary cash;
- If HRE did not begin to generate a sufficient amount of cash soon, the corpus of the CRT would not provide the required cash to meet the obligations of Trust A;
- HRE is a project far from done;
- If a "fire sale" did transpire, then plaintiff's annual stipend for life would be in jeopardy "at some time in the future."

Exhibit 20 to motion for summary judgment.

Plaintiff was concerned at that time that HRE was not being managed properly and that Trust A might not have enough money to make all of the annual payments due to her. Mr. Holmes projected in October 1998 that there did not appear to be a reasonable chance

that HRE would generate enough cash to pay plaintiff her annual stipend.   Plaintiff asserts that this projection was based on limited information because plaintiff did not have access to documents pertaining to HRE until June 30, 1999.

Mr. Holmes and Mr. Conklin met with representatives of Mercantile Bank in October 1998 to discuss the two trusts and HRE. Mr. Conklin wrote a letter to plaintiff about this time which discussed, among other subjects, the statute of limitations with regard to causes of action.   Conklin expressed the opinion that the statute of limitations for a breach of fiduciary duty claim began to run in October of 1998.   Exhibit 22 to motion for summary judgment.   In January 1999, Rebecca Miller wrote to Mr. Conklin on behalf of Mercantile Bank that the Trustee was working to bring the financial statements of HRE up to date and that "once we have three full operating years' worth of P & L statements, we can do an analysis on the company and make a decision on whether to continue in the current manner, sell the company, bring in a partner or make other changes."   Doc. No. 166, Exhibit 20.

Conklin wrote Mercantile Bank in February 1999 to demand on threat of suit that plaintiff be provided with all documents relating to the operation of the trusts.   On February 25, 1999, plaintiff sued Mercantile Bank in the district court of Shawnee County, Kansas.   The lawsuit alleged:

- "the failure of the trustee to properly manage and oversee [HRE] would serve to endanger the Plaintiff's

rights as a beneficiary under the terms of the trust."

- "In November of 1997, the Defendant informed the beneficiaries that the E.J. Erp Trust was experiencing financial difficulties in that it was 'real estate rich' and 'cash poor.'"

- "In 1998, the Plaintiff took notice of the continued lack of improvement in the financial condition of the E.J. Erp Trust...."

- In October 1998, representatives of Plaintiff met with Defendant to discuss concerns as to the trust management and Defendant "expressed concern as to the profitability of the E.J. Erp Trust."

Exhibit 24 to motion for summary judgment. Plaintiff further alleged that financial statements had not been prepared for HRE and that Mercantile Bank was unable to ascertain the profitability of HRE until financial statements had been prepared. Mercantile Bank had declined to provide HRE's corporate records to plaintiff absent a court order because plaintiff was not a shareholder of HRE.

In October 1999, Mercantile Bank and plaintiff entered into a settlement agreement. Pursuant to the agreement, plaintiff's claim regarding the review of HRE documents was released in exchange for the production of certain HRE documents and payment of $2,000.00 to plaintiff to reimburse her for her attorney's fees. The settlement agreement also provided for a continuing obligation to provide certain information and documents to plaintiff in a timely fashion as long as she was a beneficiary of Trust A. This information included but was not limited to:

corporate tax returns for Hickory Ridge, financial statements prepared by or on behalf of Hickory Ridge,

> general ledger and/or accountant's work papers used to
> prepare financial statements for Hickory Ridge, real
> estate appraisals relating to property held by Trustee or
> Hickory Ridge, settlement statements in the closing of
> the sale of real estate by Hickory Ridge, corporate
> minutes relating to Hickory Ridge, corporate business
> plans for Hickory Ridge, corporate valuations of Hickory
> Ridge, written evaluations by a trust officer of the
> status or performance of Hickory Ridge or the E.J. Erp
> Trust A, and loan documentation for borrowing by Hickory
> Ridge from lenders.

Exhibit 27 to motion for summary judgment.   The settlement

agreement further stated that plaintiff stipulated that Mercantile

Bank provided her with all records or documents to which it had

access or may obtain access prior to July 1, 1999 as requested by

plaintiff.   Id.

The settlement agreement contained the following release:

> Furthermore, in acknowledgment of Trustee's
> production of documents to date and in
> consideration and recognition of Trustee's
> covenants and representations as set forth in
> this Agreement, [plaintiff] furthermore
> releases, discharges and covenants to hold
> Trustee harmless from any and all causes of
> action, claims, demands and judgments, past or
> present, based in whole or in part, on a
> factual allegations that Trustee refused to
> provide the documentation and information
> identified in Sections 1 and 2 of this
> Agreement . . . .

Id.  The release did not cover demands, claims, or causes of action

by plaintiff against the Trustee for breach of fiduciary duty:

> arising in whole or in part from actions or inactions
> other than [plaintiff's] specific allegation that the
> Trustee refused to provide such information and
> documentation prior to this Agreement, regardless of
> whether said actions or inactions arose prior to or
> subsequent to the date of this agreement.   Without

11

limitation, said release shall specifically not include any claim, cause of action, demand or judgment for failure to properly maintain records and accounts and failure to abide by the appropriate standard of care attendant upon Trustee in managing and investing the trust corpus.

Id.

On October 22, 1999 Mr. Holmes wrote plaintiff's attorney and stated that it seemed doubtful that HRE would generate sufficient income to make the annual payment to plaintiff for her lifetime.

In letters dated December 20, 1999 and March 31, 2000, the trust administrator wrote that the farmland had been sold at auction; that the cash realized allowed the Trust A account to climb out of a cash overdraft position; and that future distributions would be made quarterly to avoid placing Trust A in an overdraft situation. It was further stated that accountants had been requested to prepare a forecast as to whether HRE could fulfill "Mr. Erp's expectations." Exhibit 29 to the motion for summary judgment.

In January 2000 plaintiff retained Steve Clinkenbeard, an accountant, to review and analyze the HRE documents plaintiff obtained from Mercantile Bank pursuant to the 1999 settlement agreement in order "to determine if a breach occurred so as to deplete the value of the trust, thus hindering its longer term ability to fulfill its obligation" to plaintiff. Exhibit 30 to the motion for summary judgment.

Later that year, after discussions between attorneys for

12

plaintiff and Mercantile Bank regarding possible litigation by plaintiff against defendant, a draft settlement agreement was completed. Plaintiff entered the settlement agreement on October 19, 2000 after discussing the matter alone with bank officers and being cautioned by her attorney.

The 2000 agreement states in part:

> Trustee will use its best efforts to cause Hickory Ridge Estates, Inc. to generate sufficient income to make distributions to Austin for her lifetime as set forth in the Trust Agreement. Without limiting the generality of the foregoing, Trustee will provide Austin with a business plan for Hickory Ridge Estates within 90 days from the date of this Agreement.
>
> Upon presentation of due and payable invoices from Austin's advisers, Trustee shall pay Austin the total sum of $7,800.00 for professional fees and expenses incurred by her in connection with the Trust. Such payment shall not be a distribution of Trust income. Austin will provide Trustee with a copy of all financial data, projections, or analyses relating to Hickory Ridge Estates prepared by her accountant, upon receipt of such payment.
>
> In consideration of the covenants and representations of Trustee set forth above, Austin hereby releases Trustee and covenants not to sue Trustee for any rights, suits, demands, claims damages, or causes of action of any nature whatsoever, known or unknown, foreseen and unforeseen which she holds or enjoys against Trustee at the date of this Agreement.
>
> . . . .
>
> This Agreement is executed by the parties hereto for the sole purpose of compromising and settling the matters described above and

13

all other disputes between them at the date of
this Agreement, whether herein described or
not.

. . . .

Each of the parties agrees that the failure of
the other party to carry out any obligation
under this Agreement shall constitute
immediate and irreparable damage, and in
addition to other remedies, the non-defaulting
party shall be entitled to injunctive and
other equitable relief, including, but not
limited to, specific performance of this
Agreement.

. . . .

The warranties, representations and covenants
of the parties hereto are integral to, and
constitute a material part of the
consideration for, this Agreement, and shall
be so construed.

This Agreement shall be governed by and
construed in accordance with the laws of the
State of Kansas.

Exhibit 32 of motion for summary judgment.

On January 9, 2001 Steven Stricker, a trust officer for
defendant, wrote plaintiff that: "It is important that Phase III
is started with streets and gutters complete so the market will see
that progress is being made. I believe the Phase III progress will
be of great value as we attempt to market the assets of HRE." Doc.
No. 166, Exhibit 36.

By February 2001, plaintiff again considered suing defendant
for breach of fiduciary duty. Plaintiff eventually filed the
complaint in this case on June 20, 2003. Plaintiff alleges in the

14

complaint that the assets of Trust A have been depleted because of the acts and omissions of defendant such that Trust A has insufficient principal and income with which to make the annual payment to plaintiff for her lifetime.  Plaintiff further alleges that defendant has refused to make distributions to plaintiff from Trust A for medical and educational expenses.

Additional excerpts from documents that are part of the summary judgment record and should be considered uncontroverted will be included later in this opinion.

III.  PLAINTIFF'S CONTENTIONS

The pretrial order states that plaintiff is asserting a breach of defendant's fiduciary and statutory duties and a breach of the 1999 settlement agreement by the defendant.  Doc. 145 at p. 57-58. The pretrial order lists an array of fiduciary and statutory duties allegedly breached by defendant:

> - failing to administer the trust solely in the interest
> of the beneficiary;
> - failing to act in good faith;
> - engaging in self-dealing and in a conflict of interest;
> - breaching the duty to account to the beneficiary, to
> deal fairly with the beneficiary and to communicate with
> the beneficiary;
> - failing to maintain complete, clear and accurate
> records;
> - failing to use the care and skill required of a trustee
> prior to making decisions;
> - failing to protect and preserve trust property;
> - failing to administer, manage and prudently invest
> trust property;
> - failing to use the care and skill required to make the
> trust property productive;
> - borrowing and/or lending money in a commercially
> unreasonable manner;

> - failing to diversify trust assets;
> - breaching duty to take and keep exclusive control of
> trust property;
> - delegating management and investment responsibilities;
> - mismanaging the trust with reckless disregard of its
> fiduciary and statutory duties.

Doc. 145 at p. 57-58.  Plaintiff also asserts that when she needed

medical care or money to pay for her education, defendant violated

its fiduciary duties by refusing to pay money from the Trust for

these expenses.  Doc. 145 at p. 20-21.

    With regard to the 1999 settlement agreement, plaintiff

asserts that after an initial disclosure of documents, defendant

failed to produce further documentation on a timely basis which led

plaintiff to threaten another lawsuit in the year 2000.  Doc. 145

at p. 33-34.

IV.  SUMMARY JUDGMENT STANDARDS

    Under FED.R.CIV.P. 56, summary judgment is appropriate in this

case if defendant demonstrates that there is "no genuine issue of

material fact" and that defendant is "entitled to a judgment as a

matter of law."  FED.R.CIV.P. 56(c).  This court must view the

evidence and all reasonable inferences therefrom in the light most

favorable to the nonmoving party, which is the plaintiff in this

case.  Spaulding v. United Transp. Union, 279 F.3d 901, 904 (10th

Cir.) cert. denied, 537 U.S. 816 (2002).  A "material" fact is

"essential to the proper disposition of the claim."  Wright ex rel.

Trust Co. of Kansas v. Abbott Laboratories, Inc., 259 F.3d 1226,

1231-32 (10th Cir. 2001) (citing Adler v. Wal-Mart Stores, Inc., 144

16

F.3d 664, 670 (10th Cir. 1998)).   A "genuine" issue of fact exists
if "there is sufficient evidence on each side so that a rational
trier of fact could resolve the issue either way." Adler, 144 F.3d
at 670 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986)).

Defendant bears the initial burden of demonstrating an absence
of a genuine issue of material fact and entitlement to judgment as
a matter of law.   Spaulding, 279 F.3d at 904 (citing Celotex Corp.
v. Catrett, 477 U.S. 317, 322-23 (1986)).   Defendant must attempt
to meet this burden by pointing "to those portions of the record
that demonstrate an absence of a genuine issue of material fact
given the relevant substantive law." Thomas v. Wichita Coca-Cola
Bottling Co., 968 F.2d 1022, 1024 (10th Cir.) cert. denied, 506 U.S.
1013 (1992).   If defendant meets this initial burden, then the
burden shifts to plaintiff to "come forward with 'specific facts
showing that there is a genuine issue for trial.'" Spaulding, 279
F.3d at 904 (citing Matsushita Elec. Indus. Co. v. Zenith Radio
Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986));
Anderson, 477 U.S. at 256, 106 S.Ct. 2505; Celotex, 477 U.S. at
324, 106 S.Ct. 2548.   Plaintiff may not rest upon her pleadings to
meet this burden.   Anderson, 477 U.S. at 256; accord Eck v. Parke,
Davis & Co., 256 F.3d 1013, 1017 (10th Cir. 2001).   Rather,
plaintiff must set forth specific facts that would be admissible in
evidence in the event of trial from which a rational trier of fact

could find for plaintiff.  <u>Mitchell v. City of Moore, Oklahoma</u>, 218 F.3d 1190, 1197 (10th Cir. 2000).  The facts should be identified by reference to an affidavit, a deposition transcript, or a specific exhibit.  <u>Id.</u>

Summary judgment is not a "disfavored procedural shortcut;" rather, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'"  <u>Celotex</u>, 477 U.S. at 327 (quoting Fed.R.Civ.P. 1).

V.  ARGUMENTS RELATING TO SUMMARY JUDGMENT

    A.  **Release**

Defendant's first argument for summary judgment is that plaintiff's claims have been released pursuant to the 2000 settlement agreement between the parties.  Exhibit 33 of the motion for summary judgment.  The parties agree that Kansas law favors settlement of disputes and the enforcement of settlement agreements.  See <u>Krantz v. University of Kansas</u>, 21 P.3d 561, 567 (Kan. 2001).

Plaintiff contends that the release should not be enforced in this situation for two reasons:  first, because defendant breached the settlement agreement by failing to provide a business plan for HRE within 90 days of the date of agreement; and second because the settlement agreement was obtained through duress.

Defendant is willing to assume for purposes of argument that defendant did breach the settlement agreement by failing to provide

18

the business plan as required by the 2000 settlement agreement. Nevertheless, defendant contends the release is enforceable because it was not contingent upon continuing performance and because the settlement agreement is not divisible. Defendant further denies plaintiff's contention that the settlement agreement was obtained through duress and asserts that plaintiff has waived the right to claim duress.

The court finds defendant's release arguments to be persuasive. Defendant's alleged breach of the 2000 settlement agreement does not empower plaintiff to bring a lawsuit based on the claims that were released. "[G]enerally, in the absence of bad faith or fraud, when parties enter into an agreement settling and adjusting a dispute, neither party is permitted to repudiate it." Krantz, 21 P.3d at 567.

Plaintiff may not repudiate the 2000 settlement agreement under the circumstances of this case for the following reasons. First, this remedy is not consistent with the language of the agreement. A settlement agreement is a contract and interpreted as such. Krantz, 21 P.3d at 567; Duffy Theatres, Inc. v. Griffith Consol. Theatres, Inc., 208 F.2d 316, 323-24 (10th Cir. 1953) cert. denied, 347 U.S. 935 (1954) (construing a release according to contractual principles). In the instance of the 2000 settlement agreement, the language states that the failure to carry out any obligation under the agreement shall be grounds for injunctive

19

relief and specific performance, "in addition to other remedies."
Exhibit 33, p. 4. The agreement does not state that a party may
repudiate or rescind the agreement in the event that the other
party does not fulfill an obligation under the agreement.
Normally,

> a valid release . . . conclusively estops the parties
> from reviving and litigating the claim released as a
> final act, and it forever extinguishes a personal right
> of action.  It completely discharges and extinguishes all
> rights and claim of the releasor against the releasee
> which are included in the release; and this is true, even
> though the releasee fails fully to perform a promise
> which was the consideration for the release, unless the
> operation of the release was based upon full performance.

In re Atwater, 266 F. 278, 281 (2nd Cir. 1920); see also, Folley v.
Henderson, 175 F.Supp.2d 1007, 1011-12 (S.D.Ohio 2001); Breen v.
Norwest Bank Minnesota, 865 F.Supp. 574, 577-78 (D.Minn. 1994).
Under Kansas law, a claim may be settled through an executory
accord which is "an agreement for the future discharge of an
existing claim by a substituted performance." Elliott v. Whitney,
524 P.2d 699, 703 (Kan. 1974) (quoting, 6 Corbin on Contracts §
1268, p. 71).  With an executory accord, "it is the promised
performance that is to discharge the existing claim, and not the
promise to render such performance." Id. The language of the 2000
settlement agreement demonstrates that it was not an executory
accord, however.  The parties stated, "In consideration of the
covenants and representations, Austin hereby releases Trustee and
covenants not to sue Trustee . . ." Exhibit 33, p. 3.  This

language is consistent with a release upon the promise of performance, not a release upon promised performance. See Elliott, 524 P.2d at 704.

Plaintiff asserts in a seemingly belated fashion that the failure to produce a business plan within 90 days of the settlement agreement was a material breach that discharges plaintiff from performance of the agreement. However, the release of the claims had already been made and, as discussed later, plaintiff provides no persuasive grounds for undoing that release. Plaintiff does not claim that the settlement agreement is divisible, nor does the court believe that it is. See Sykes v. Perry, 176 P.2d 579, 582-83 (Kan. 1947). Therefore, plaintiff may not link performance of her release to the performance of the business plan plank of the settlement agreement.

Plaintiff claims that she agreed to the 2000 settlement agreement under duress. In support of this claim, plaintiff states that she was told by Steve Stricker on behalf of defendant that HRE was "right where [he] want[ed] it to be;" that he needed approximately 90 days to turn it around; and that it would be okay because there was still enough land "if Phase III could get started." Plaintiff's affidavit, Doc. 166, Exhibit 28. Plaintiff further claims that settlement discussions were initiated by defendant with her outside the presence of her attorney and that she was financially destitute. Plaintiff illustrates defendant's

21

alleged desire to rush through the settlement by claiming that defendant waived the requirement of a physical examination to obtain a loan that was part of the settlement agreement, after plaintiff refused to have the physical.

The statements to which plaintiff refers were allegedly made on or about September 20, 2000.  Plaintiff's counsel made clear in a letter dated October 3, 2000 that plaintiff would be acting outside of his advice if she agreed to the settlement that was executed on October 19, 2000.  Exhibit 22 of the motion for summary judgment.  This lawsuit was filed years later on June 20, 2003.  Yet, plaintiff first mentioned duress or fraud in response to the motion for summary judgment.  Plaintiff even failed to reference duress or fraud in the December 1, 2004 pretrial order.

We agree with defendant that plaintiff cannot seek to rescind or repudiate the 2000 settlement agreement at a time so distant from the actions which are alleged to constitute fraud or duress.  The law is clear in Kansas that a person seeking to rescind a contract on the grounds of duress or fraud must do so promptly.  J.C. Nichols Company v. Meredith, 391 P.2d 136, 140 (Kan. 1964) (fraud); Wingerd v. Foley, 127 P.2d 524, 528 (Kan. 1942) (duress).  Plaintiff has not acted promptly to make these claims in this instance.  Moreover, the facts alleged by plaintiff do not amount to duress.  See Thiessen v. General Electric Capital Corp., 232 F.Supp.2d 1230, 1243 (D.Kan. 2002) (economic necessity to sign a

waiver is insufficient to demonstrate duress); Comeau v. Mt. Carmel Medical Center, Inc., 869 F.Supp. 858, 864-66 (D.Kan. 1994) (concern for financial position, danger of losing job, and absence of counsel does not establish duress).

In conclusion, the release signed by plaintiff provides one grounds for summary judgment against plaintiff's claims in this case, including any claim based upon an alleged breach of the 1999 settlement agreement.

B.  **Statute of limitations**

There is a two-year statute of limitations for plaintiff's claims of breach of fiduciary duty.  K.S.A. 60-513(a).  Defendant argues that plaintiff's claims of breach of fiduciary duty are time-barred.

1.  Standards  Tort claims accrue in Kansas when "the fact of injury becomes reasonably ascertainable to the injured party . . ." K.S.A. 60-513(b).  This date is either when the alleged tortious conduct has first caused substantial injury or at the point when the plaintiff either knew or reasonably should have ascertained that the alleged tortious conduct caused plaintiff to be injured.  Id.   "A tort cause of action accrues when the elements of duty, breach, and resulting injury or damage are present." Holt v. Wesley Medical Center, 86 P.3d 1012, 1016 (Kan. 2004).  "Injury" means an invasion of a legally protected interest, possibly without harm or loss, which is sufficient to entitle the

injured person to maintain an action of tort.  RESTATEMENT (Second)
OF TORTS § 7 Comment a (1965).  "In general, a cause of action
accrues, as to start the running of the statute of limitations, as
soon as the right to maintain a legal action arises.  The true test
to determine when an action accrues is that point in time at which
the plaintiff could first have filed and prosecuted his action to
a successful conclusion." Pancake House, Inc. v. Redmond, 716 P.2d
575, 579 (Kan. 1986).

"Kansas law does not require that the plaintiff have ironclad
actual knowledge about his injury, but rather that he have such
notice as would permit him to discover the injury with the use of
due diligence.  'Reasonably ascertainable' does not mean 'actual
knowledge.'" KPERS v. Blackwell, Sanders, Matheny, et al., 114
F.3d 679, 689 (8th Cir. 1997) cert. denied, 522 U.S. 1068 (1998)
(applying Kansas law).  "The critical information to trigger the
running of the statute of limitations is knowledge of the fact of
injury, not the extent of injury." Brueck v. Krings, 638 P.2d 904,
908 (Kan. 1982).

2.  Defendant's claims  Defendant asserts without
contradiction that plaintiff knew prior to the 2000 settlement
agreement of many claims of misconduct that are listed in the
pretrial order.  In its summary judgment motion defendant recites
many of these claims and contends that plaintiff was aware of the
facts surrounding the claims more than two years before plaintiff

filed the instant lawsuit.  In addition, defendant notes that
plaintiff stated in her deposition that in February 2001 she knew
that Trust A was not going to generate enough money to make the
annual payment and she was contemplating another lawsuit.

       3.  <u>Plaintiff's claims</u>  Plaintiff mostly does not contest
defendant's specific assertions.  Plaintiff contends, however, that
her cause of action did not accrue until:  1) she was first
notified by Gerald Gleason of the defendant on December 11, 2001
that the Trust would not generate sufficient income to fund the
annual payments to plaintiff for her lifetime; or 2) on July 11,
2002 when HRE was sold for a price less than the amount required to
fund the annual payments to plaintiff for her lifetime.  Plaintiff
asserts that this is when the more specific alleged instances of
misconduct caused plaintiff substantial injury or reasonably
ascertainable injury.  Plaintiff further states that Trust
representatives made statements in 2000 and 2001 which assured her
that HRE was "right where it should be" and it would generate
sufficient income to make the projected annual payments.  These
statements and others made by Steve Stricker of defendant's trust
department provide the basis, at least in part, for plaintiff's
claim that the doctrines of continuous representation and equitable
estoppel defeat defendant's statute of limitations argument.
Plaintiff also notes that the Trustee's eventual decision to
liquidate HRE was not made until August 2001 and that the first

time she did not receive her projected annual distribution was
2002.

In addition, plaintiff has signed an affidavit which states
that she was extremely tired during her deposition and that when
she stated she knew that Trust A was not going to generate enough
income in February 2001, she was answering "out of anger, and with
hindsight knowledge, because I was tired, and because I knew that,
in the end, the liquidation sale of HRE's assets did not result in
revenue to Trust A. . . . I did not have the knowledge at the date
of the occurrence." Plaintiff's affidavit, Doc. 166, Exhibit 28.

        4. <u>Case law</u>  In <u>Brueck</u>, the Kansas Supreme Court held
that the depositors of a failed savings and loan had sufficient
knowledge of an injury from the alleged failures of an auditing
firm and therefore were barred from suing, even though the doors of
the savings and loan were not closed until a date within two years
of the action against the auditing firm. According to the court,
it was appropriate for the trial court to rely upon press accounts
that the savings and loan "showed signs of faltering or having
financial difficulty" and that the savings and loan was placed
under a trusteeship more than two years before the action was
commenced. 638 P.2d at 908. Additionally, more than two years
before the claim was filed, there were published statements of
large-scale withdrawals by depositors. <u>Id.</u>

In <u>KPERS</u>, the plaintiff pension fund alleged fraud on the

26

grounds that $50 million it invested with a savings and loan for the purpose of buying another savings and loan was not used for that purpose.  The court held that these claims were barred because plaintiff had notice that the deal to purchase the savings and loan was probably dead more than two years before the lawsuit was filed. 114 F.3d at 689.

In <u>Miller v. Foulston, Siefkin, Powers & Eberhardt</u>, 790 P.2d 404, 415 (Kan. 1990), the plaintiff/law partner of the defendant alleged that he was wrongfully discharged but that substantial injury did not occur until he became aware that the law firm had filed for and received extraordinary fees in litigation the firm had pending prior to the discharge.  The Kansas Supreme Court rejected this argument and held that while the amount of recovery was unknown at the time of the plaintiff's discharge, the potential for recovery was known and this was sufficient to start the running of the limitations period once plaintiff was discharged.  790 P.2d at 414.

In <u>Heinrichs v. Peoples Bank</u>, 992 P.2d 1241, 1244 (Kan.App. 1999), the court held that the estate of a woman in a nursing home had notice of the wrongful depletion of her bank account when she and her family were informed by her attorney that she was running out of money to pay for her care.

In <u>Johnston v. Farmers Alliance Mutual Ins. Co.</u>, 545 P.2d 312, 316-17 (Kan. 1976), the court held that a retaliatory discharge

claim accrued when the employee was notified of his termination, even though the employee continued to draw pay after such notice was given. The court stated: "Although some damages to the plaintiff may not have accrued under the accounting principles until installments of salary had ceased, plaintiff sustained substantial injury upon receipt of official notice of termination . . . and his cause of action accrued on that date." 545 P.2d at 317. See also, Whye v. City Council for City of Topeka, 102 P.3d 384, 387 (Kan. 2004) (constructive discharge claim accrued when officer took early retirement, not when retirement became effective).

    5.  <u>Analysis</u>  These cases do not require complete certainty as to the fact or the amount of damages to begin the expiration of the limitations period. We believe they support a finding on the uncontroverted facts before the court that the limitations period expired upon plaintiff's breach of fiduciary duty claims prior to the filing of the instant case.

In this case, on September 14, 1998 plaintiff's attorney was informed by her accountant, Robert Holmes, that:

> Listed as one of the asserts of the CRT is a demand note receivable for $143,565.66 from Trust A. Correspond-ingly, there is a demand not payable for the same amount on the statement for Trust A to the CRT. The alarming item is that Trust A reflects an overdraft in its Cash and Cash Equivalents of $2,632.

> [W]hile [plaintiff's] annual stipend continues to increase at a rate of three percent compounded, the remittance from the CRT is in a downward spin. Over time

> this will create a bigger and bigger cash requirement on
> Trust A, which is in essence Hickory Ridge Estates, Inc.,
> and while it does not seem to be impossible for Hickory
> Ridge to generate the necessary cash, it does currently
> appear suspect, with its prospects worsening by the year.
>
> [T]he [Hickory Ridge] project certainly seems to be
> undermanned and undermanaged at this point.
>
> [T]his situation is slow[ly] coming to a head.   If
> Hickory Ridge Estates, Inc. does not begin to generate a
> sufficient portion of cash soon, and the corpus of the
> CRT dwindles and does not provide the required cash to
> meet the obligations of Trust A, then it may be forced to
> sell its own assets . . . . It would seem to me that the
> Trustee of both the CRT and Trust A should be concerned
> about these issues and in order to avoid a large group of
> unhappy people should address the situation as quickly as
> possible.

Exhibit 20 of the motion for summary judgment.

On October 8, 1998 Mr. Holmes wrote to defendant's trust

department:

> Ms. Austin's primary question is:  Will Hickory Ridge
> Estates, Inc. generate enough cash to pay her anticipated
> stipend for the rest of her life.  From what is known at
> this point it does not appear this has a reasonable
> chance of actually transpiring.

Exhibit 20 of the motion for summary judgment.

On October 22, 1999 Mr. Holmes wrote plaintiff's attorney a

report which contained the following statements.

> [T]he combined corpus of the trusts has been depleted
> substantially over what it initially was.  This is not a
> comforting trend given [plaintiff's] life expectancy and
> the increasing schedule of [plaintiff's] annual stipend.
>
> The long and the short of it is that if these trusts are
> going to succeed over [plaintiff's] life expectancy,
> Hickory Ridge Estates, Inc. will need to generate [a]
> substantial amount of income.  Given the performance to
> date, this seems doubtful.

> There seems to be a lack of real financial progress for
> Hickory Ridge when one considers the four years plus
> since Mr. Erp's death and a retained earnings figure of
> slightly over thirty thousand dollars.  It seems obvious
> that the progress is far under what was anticipated and
> frankly is not acceptable.  Further organization and
> management of the assets is below the business plan
> estimates and what might be expected from the sale of 41
> lots at an average price of over $20,000.  The problem is
> that [plaintiff] is in peril of not receiving the income
> for life not because her father did not leave adequate
> assets, but because the assets he left are not producing
> as they should.

Exhibit 28 of the motion for summary judgment.  These documents

from Mr. Holmes identified specific practices which he considered

inconsistent with proper management of Hickory Ridge Estates and

the two trusts.

On May 25, 2000 plaintiff's attorney wrote to defendant's

attorney that:

> [The financial statements for the Trusts] do not appear
> to be particularly optimistic as to the success of this
> project.   I am now hearing rumblings from other
> dissatisfied beneficiaries as well, who appear to be
> concerned as to the lack of benefit derived from Hickory
> Ridge or the trust operations.

Exhibit 31 of the motion for summary judgment.  The letter urged

the necessity of receiving a timely report regarding how the trust

was to "meet its goals of providing for my client's future."  <u>Id.</u>

On October 3, 2000 plaintiff's attorney wrote to confirm the

contents of his conversation with plaintiff on September 27, 2000

regarding the settlement she reached with defendant.  According to

the letter:

> On or about September 20, 2000 you made a decision to

30

meet with Mr. Stricker and Mrs. Miller without the
assistance of counsel.  You indicated your disappointment
with Mr. Stricker's statements to you in that he did not
appear to have any interest in resolving this dispute
amicably, but instead appeared to be intent on proceeding
with the development as planned.  <u>During the meeting, Mr.
Stricker acknowledged that the trust would run out of
money in approximately 2014.</u>  Thereafter, on or about
September 27, 2000 you contacted Mrs. Miller without my
counsel, and offered to resolve this dispute in return
for Firstar's immediate payment of your 2001 stipend,
payment of your outstanding obligations to myself and Mr.
Clinkenbeard, and a promise on the part of Firstar to
take action with respect to the management of Hickory
Ridge Estates, Inc. within 90 days.

Exhibit 22 of the motion for summary judgment (emphasis added).[1]

The letter further advised plaintiff of the "potential issue"
of the statute of limitations and stated that it was plaintiff's
attorney's "belief that you first became assured of the breach [of
fiduciary duty] at the time of Mr. Holmes meeting with Firstar Bank
in approximately late October of 1998."  <u>Id.</u>  The letter also
mentioned certain arguments which might be employed to defeat a
statute of limitations defense.

On February 23, 2001 plaintiff's attorney reviewed the matter
in a letter to another attorney and stated:

On July 27, 1999, I met with Mr. Holmes at the office of
Rich Hayse to review the documents made available by the
trustee.  It was at that time, that Mr. Holmes recognized
the extent to which Firstar had misrepresented and

---

[1] Plaintiff's affidavit states that she does not recall Steve
Stricker saying the trust would run out of money by 2014 and that
he did not tell her this.  But, she does not dispute that this
statement is recounted in her counsel's October 3, 2000 letter to
plaintiff which preceded plaintiff's execution of the 2000
settlement agreement.

> concealed the status of the trust.  Financial statements,
> which had only recently been prepared by Firstar for
> years as far back as 1996 revealed that the retained
> earnings for the first four years of the trust were
> virtually non-existent.

Exhibit 30 of the motion for summary judgment.  Plaintiff's

attorney detailed various acts of mismanagement, some of which were

allegedly admitted by a former trust officer.

> [T]he true issue is can the trust be restored to the
> extent that it will pay Ms. Austin her stipend for the
> remainder of her life.  Mr. Clinkenbeard [plaintiff's
> accountant] was of the opinion, as recently as the summer
> of 2000, that this possibility still existed in the event
> that Firstar took appropriate action to remedy the
> situation.  Apparently, the situation has become steadily
> worse over the preceding six months.
>
> [I]t appears that Firstar's decision to proceed with the
> development without an experienced developer, its failure
> to monitor the activities of the development, its failure
> to evaluate and take corrective action, and its failure
> to maintain and review adequate documentation have all
> lead to the distinct possibility that the trust will fail
> to fulfill its objectives.  Furthermore, and for the
> first time, it has been learned within the last thirty
> days, that Firstar has pledged assets from the CRT as
> collateral for its loans to the Erp Trust.  By virtue of
> Firstar's own admission, there does not appear to be any
> document which would authorize or support such an act.
> It is of particular importance because given the cash
> shortage associated with the Erp Trust, Ms. Austin's
> stipend comes in large part from the CRT's yearly payment
> to the Erp Trust.  Since the yearly payment is based on
> a percentage of the CRT assets, that payment becomes
> endangered once the CRT assets are subject to
> foreclosure.

Id.

Plaintiff stated in her deposition that she knew by February

2001 that the trust was not going to generate enough money and that

they were going to liquidate HRE.  By then, she was considering

32

another lawsuit with a new attorney.  After defendant filed the
instant summary judgment motion, plaintiff filed an affidavit
stating that these answers were made out of anger and exhaustion,
and with hindsight knowledge that the liquidation of HRE's assets
did not result in revenue for Trust A.  Defendant asserts that this
aspect of plaintiff's affidavit should be disregarded because it
presents a sham issue.

    The Tenth Circuit has summarized the law on sham issues in
Burns v. Board of County Commissioners, 330 F.3d 1275, 1281-82 (10th
Cir. 2005):

> "There is authority for the proposition that in
> determining whether a material issue of fact exists, an
> affidavit may not be disregarded because it conflicts
> with the affiant's prior sworn statements.". . . Factors
> to be considered in determining whether an affidavit
> presents a sham issue include "whether the affiant was
> cross-examined during his earlier testimony, whether the
> affiant had access to the pertinent evidence at the time
> of his earlier testimony or whether the affidavit was
> based on newly discovered evidence, and whether the
> earlier testimony reflects confusion which the affidavit
> attempts to explain."

(Quoting, Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)).
In this case, plaintiff was cross-examined during her deposition
and she had access to the pertinent evidence at the time of her
deposition.  No newly discovered evidence applies in this instance.
Therefore, the only factor listed above which must be considered is
whether the earlier testimony "reflects confusion which the
affidavit attempts to explain."  In this instance, plaintiff's
deposition does not reflect confusion or even indecision.  Although

several breaks were taken during the course of the deposition, we do not dispute that plaintiff was tired when she gave her answers. But, she was aware of the significance of the statute of limitations before and during her deposition, and her testimony regarding her knowledge in February 2001 does not appear vague or confused.    Therefore, we believe the affidavit should be disregarded to the extent that it contradicts the deposition on this point.  See Thurman v. Sears, Roebuck & Co., 952 F.2d 128, 136 n.23 (5th Cir.) cert. denied, 506 U.S. 845 (1992); Hackman v. Valley Fair, 932 F.2d 239, 240-41 (3rd Cir. 1991); see also, Lantec, Inc. v. Novell, Inc., 306 F.3d 1003, 1017 (10th Cir. 2002).

However, even if the court accepted plaintiff's affidavit on this point for the purposes of summary judgment, the court would still conclude from the other evidence on record and Kansas case law that plaintiff's breach of fiduciary duty claims are barred by the statute of limitations.  Plaintiff was aware of much of the conduct which she asserts was a breach of fiduciary duty far longer than two years before she filed this lawsuit.  She and her advisers believed that this conduct had the impact of reducing the value of Trust A and HRE to the extent that it was reasonable to think that plaintiff's full annual stipend would not be paid over her lifetime.  Even though plaintiff was first informed by defendant that the stipend provisions could not be satisfied less than two years before bringing this lawsuit, we believe that plaintiff's

injury or damage was reasonably ascertainable more than two years before plaintiff filed her complaint and therefore this case is barred by the statute of limitations.

We believe this holding is consistent with the case law reviewed previously in this opinion.  We acknowledge plaintiff's citation to <u>Whittenburg v. L.J. Holding Co.</u>, 830 F.Supp. 557 (D.Kan. 1993) and <u>Bold v. Spitcauksky</u>, 942 P.2d 652 (Kan.App. 1997).  We believe these cases are distinguishable because they involved fact situations where the plaintiffs either could not bring a successful cause of action of any kind or could not bring a successful cause of action for damages because any provable injury or damage did not occur until some time after the alleged tortious conduct.  In this instance, we believe plaintiff could determine injury or damage to her interests with certainty more than two years before she brought this action.

6. <u>Equitable estoppel</u>    Plaintiff asserts that defendant should be estopped from asserting a statute of limitations defense because plaintiff was told by defendant's agents that the trusts would generate enough income to pay the stipend to plaintiff over her lifetime.  Plaintiff cannot prevail upon her estoppel argument if she did not rely upon the representations providing the basis for the argument.  By February 2001, and more than two years before plaintiff filed this lawsuit, she knew that defendant had not presented a satisfactory business plan and that the trusts were not

going to fund the annual stipend over her lifetime, in spite of any comments to the contrary.  For this reason, she was again looking at bringing suit against defendant in February 2001.

The doctrine of equitable estoppel has been described as follows:

> Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct.  A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed.  It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts.

United American State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc., 561 P.2d 792, 795 (Kan. 1977).

> Under Kansas law, equitable estoppel applies if defendants have induced plaintiffs to delay their filing of the action either through affirmative acts or through silence concerning material facts when under affirmative duty to speak. . . . Actual fraud in the technical sense is not required but a defendant must be found to have "lulled" his or her adversary into a false sense of security to forestall the filing of suit.

City of Wichita, Kansas v. U.S. Gypsum Co., 72 F.3d 1491, 1499-1500 (10th Cir. 1996) (citations omitted).

In Miller, the Kansas Supreme Court rejected an argument for equitable estoppel by making reference to a case where a university sued over a leaky roof.  The court stated:

> The facts here are similar to the events that occurred in Friends University.  Although Friends had not determined the exact scientific cause of the leaking

36

> roof, this did not toll the running of the statute of
> limitations because Friends was fully aware that a severe
> problem existed, yet elected to seek a nonjudicial
> resolution of the controversy by making repeated demands
> to repair the roof.

790 P.2d at 417-18. The <u>Miller</u> court found that the attorney

plaintiff was capable with due diligence of identifying the

potential recovery of attorney fees he lost when he was separated

from the defendant law firm.

In the case at bar, almost from the beginning of defendant's

trusteeship in 1995 plaintiff believed there were problems and

dangers to her interests. She engaged counsel and accountants to

investigate her concerns and she had listened to or read reports,

forecasts, and financial statements regarding the status of the

trusts. This led plaintiff to sue and threaten to sue defendant in

1999 and 2000. Plaintiff elected to settle these disputes. Even

if the last settlement was motivated in part by optimistic

statements regarding HRE, this optimism had faded in plaintiff's

eyes by February 2001 when she was again contemplating a lawsuit

against defendant. The court holds that there are no reasonable

grounds to find that plaintiff in fact did rely or had good grounds

to rely upon statements that HRE could still be "turned around" or

that it was "right where it should be" to wait as long as she did

to file suit in this case. The statements do not estop defendant

from raising a statute of limitations defense. See <u>Winchester v.</u>

<u>Lester's of Minnesota, Inc.</u>, 983 F.2d 992, 994 (10th Cir. 1993)

(efforts to have defendant repair ventilation system does not estop defendant from asserting statute of limitations); <u>Friends University v. W.R. Grace & Co.</u>, 608 P.2d 936, 939-40 (soliciting defendant to repair roof does not suffice to toll operation of the statute of limitations); see also, <u>KPERS</u>, 114 F.3d at 689 (existence of fiduciary relationship with defendant does not relieve obligation upon plaintiff to exercise due diligence).

      7. <u>Continuous representation</u>  Plaintiff has also asserted that the doctrine of continuous representation acts to toll the limitations period in this case.  The continuous representation doctrine has been applied, mostly in attorney malpractice cases, to delay the running of a statute of limitations period to sue for attorney negligence.  The purpose of the doctrine is to maintain the continuity of an attorney-client relationship by permitting an attorney time to correct an error and permitting a client the opportunity to proceed with the attorney-client relationship in spite of an error.  <u>Morrison v. Watkins</u>, 889 P.2d 140, 148 (Kan.App. 1995).  The doctrine, however, does not apply when the client has assumed an adversarial stance toward the attorney, even if the client has not formally fired the attorney. <u>Id.</u>  Obviously, plaintiff and defendant did not have an attorney-client relationship.  But assuming that the Kansas courts would apply the continuous representation doctrine to the relationship which existed between plaintiff and defendant, plaintiff took on an

adversarial stance toward defendant when she sued and threatened to sue defendant. Therefore, the continuous representation doctrine does not apply to defeat the operation of the statute of limitations.

C. **Payment of medical and educational expenses**

The trust agreement as amended directs the trustee to make the following distribution to plaintiff:

> During the lifetime of my daughter, Anna M. Austin, I direct that the Trustee distribute to her from time to time, but at least annually, first from income and then to the extent necessary from principal, the sum of Thirty Thousand Dollars ($30,000.00) per year, commencing as of the date of my death. Said sum shall be increased by three percent (3%) each year subsequent to the date of my death. . . . .
> Any income remaining after the distribution to Anna M. Austin provided for above, shall be distributed equally among the following individuals who are living at the time of such distribution: Irene E. Chizk, . . . Lloyd Erp, . . . Lola E. Overson, . . . Donald Erp, . . . [and] Mari Jaquith.

Exhibit 3 of the motion for summary judgment, p. 5.

The trust agreement also lists over several pages the powers of the trustee which include:

> To make distributions to or for any beneficiary (including Grantor) in any one or more of the following ways: Directly to such beneficiary; by payment of expenses for such beneficiary's comfort, support, health, maintenance, or education; by distributing the same to guardian or conservator of such beneficiary; . . . by purchasing or distributing any securities . . . ; by depositing payments in any bank account in the name of the beneficiary . . .; and any and all other ways authorized by law.

Exhibit 2 of the motion for summary judgment, p. 12.

The court agrees with defendant that this language is clear and that it does not permit a trustee to make payments for educational or medical expenses which exceed the annual stipend listed in the amended trust agreement.  We further agree with defendant that plaintiff has conceded that plaintiff did not ask for the payment of educational expenses.  See Statement of Fact # 51 to motion for summary judgment.   Therefore, the court shall grant judgment against the claim that defendant breached a fiduciary duty by refusing to pay plaintiff's claims for educational or medical expenses.

VI.  CONCLUSION

For the above-stated reasons, defendant's motion for summary judgment shall be granted.

**IT IS SO ORDERED.**

Dated this 25th day of January, 2006 at Topeka, Kansas.


s/Richard D. Rogers
United States District Judge